**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| KRISTEN ION, on behalf of herself and all others similarly situated, )<br><br>Plaintiff, )<br>v. )<br><br>PIZZA HUT, LLC, a Delaware limited liability company, )<br><br>Defendant. )<br>_____ ) | Case No.:  4:17-cv-00788<br><br>Jury Trial Demanded |

## CLASS ACTION COMPLAINT

Plaintiff, KRISTEN ION, on behalf of herself and all others similarly situated, with knowledge as to her own actions and events, and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE ACTION

1.      This action challenges under Section 1 of the Sherman Act a no-solicitation and no-hiring agreement between and among Defendant Pizza Hut, LLC ("Defendant" or "Pizza Hut") and its franchisees, pursuant to which the franchisees agreed not to recruit or hire each other's management employees or Pizza Hut management employees.  Pizza Hut, at its principal place of business located in Plano, Texas, was intimately involved in forming, monitoring, and enforcing this anti-competitive contract, combination, or conspiracy.  Pizza Hut orchestrated, dispersed, and enforced the agreement among itself and all franchisees, at least in part, through an explicit contractual prohibition contained in standard Pizza Hut franchise agreements.  The practice at issue reflects a naked restraint of competition and a per se violation of the antitrust laws.

2.      Pizza Hut is the largest pizza company in the world with over 16,000 restaurants worldwide.[1]  More than 95% of Pizza Hut's restaurants worldwide are franchise businesses that are independently owned and operated, and are separate and distinct entities from Pizza Hut.[2]

3.      Pizza Hut boasts on its franchise website that "[its] goal is to make everyone proud to work at Pizza Hut.  That means encouraging them to be the best version of themselves and making the work environment friendly and fun."[3]

4.      As part of Pizza Hut's system to maintain its strength as the largest pizza company in the world, Pizza Hut, together with its franchisees, has colluded to suppress the wages of the restaurant-based management employees who work at Pizza Huts throughout the United States. In particular, Pizza Hut and its franchisees have contracted, combined, and/or conspired to neither hire nor solicit each other's management employees.  Pizza Hut effects this plan through an explicit contractual "no hire" and "no solicitation" clause in its franchise agreements that expressly states "neither PHLLC [Pizza Hut, LLC] nor Franchisee may employ, directly or indirectly, any individual in a managerial position who is at the time, or was at any time during the prior 6 months, employed in a managerial position by the other party, nor may Franchisee employ, directly or indirectly, any individual in a managerial position, who is or was at any time during the prior 6 months employed in a managerial position by any other franchisee of PHLLC" without written consent of the current or former employer.[4] This agreement, which is or was evidenced by express contractual provisions in the standard Pizza Hut franchise agreement, is an unreasonable restraint of trade.

---

[1] http://franchise.pizzahut.com/why-us/ (last visited August 22, 2017);
https://www.entrepreneur.com/franchises/pizzahutllc/282696 (last visited August 22, 2017).
[2] https://www.entrepreneur.com/franchises/pizzahutllc/282696 (last visited August 22, 2017).
[3] http://franchise.pizzahut.com/culture/ (last visited August 22, 2017).
[4] Section 13.2 of Franchise Agreement, 2017, attached hereto as Exhibit A.

5.      As the Department of Justice Antitrust Division and Federal Trade Commission's joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third party intermediary, are per se illegal under the antitrust laws."[5]   The *Guidance* further elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services. It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[6]

6.      The principle of free competition applies to the labor market as well as to trade.  "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers," says Joseph Harrington, Wharton professor of business economics and public policy, in his description of a no-poaching agreement.

7.      According to Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, no-poaching agreements are unfair to employees and such a pact "benefits the companies at the expense of their employees."  Mr. Cappelli notes that the reason such agreements are illegal and violate both anti-trust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."

8.      The collusion of employers to refrain from hiring each other's employees restricts employee mobility.  This raises employers' power in the market at the expense of employees and

---

[5] Available at https://www.justice.gov/atr/file/903511/download (last visited 9/17/2017).
[6] *Id.*

diminishes employee bargaining power for workers within the franchise chains.  This is especially harmful to management employees of Pizza Hut and its franchises as those employees are usually paid below a living wage,[7] and their marketable skills acquired through their work at Pizza Hut primarily have value only to other Pizza Hut restaurants and do not transfer to other fast food restaurants or similar businesses.

9.      This no-solicitation and no-hiring agreement between and among Pizza Hut and Pizza Hut franchisees, pursuant to which Pizza Hut franchisees agreed not to recruit each other's management employees (even those management employees that approached another Pizza Hut franchise for a job of their own volition) eliminated franchisees' incentives and ability to compete for management employees, and restricted management employees' mobility.  This agreement, far from being based on "sound principles," harmed management employees by lowering salaries and benefits they otherwise would have commanded in an open marketplace and depriving them of better job growth opportunities.

10.     This agreement between and among Pizza Hut and Pizza Hut franchisees is a naked restraint of trade that is per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

## THE PARTIES

11.     Plaintiff KRISTEN ION ("Plaintiff") is a resident of Allegheny County, Pennsylvania.  Plaintiff is a management employee of Aurora Huts, LLC, which owned and operated the Pizza Hut store located at 12330 Perry Highway, Suite 280, Wexford, Pennsylvania.

---

[7] In 2014, the average hourly wage of fast food employees is $9.09 or less than $19,000 per year for a full time worker. The poverty level of a family of four in the U.S. is $23,850.  Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack,* CNN Money (May 20, 2014) http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited August 14, 2017).

12. Plaintiff has suffered reduced wages and loss of professional growth opportunities because of the express restraint of trade in Pizza Hut franchise agreements prohibiting management employees from working for Pizza Hut and/or any other franchisee of Pizza Hut if they were employed in a managerial position by the other party during the prior 6 month period.

13. Plaintiff was hired with the promise that she would start as a shift manager with a pay rate of $9/hour but she was instead hired at $7.25/hour. Plaintiff received a raise to a pay rate of $8.05/hour and continued to work two and one-half years as a shift manager at twelve of Aurora Hut's Pizza Hut franchise locations. Plaintiff was never promoted and was raised to her current pay rate of $10/hour, which she received only after threats of quitting and giving her two-week notice. Plaintiff often works extra shifts and has put in work weeks of over 70 hours.

1. Defendant Pizza Hut, LLC is a Delaware limited liability company with its principal place of business in Plano, Texas. It is a wholly-owned subsidiary of its parent and predecessor, Yum! Brands, which is a North Carolina corporation with its principal executive offices in Louisville, Kentucky. Pizza Hut is in the business of selling food to customers primarily through independently owned and operated franchise restaurants. It has multiple franchise restaurants in Texas, Pennsylvania, and every state in the United States. It may be served through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

## CO-CONSIPRATORS

14. Various other corporations and persons not made defendants in this Complaint, including Pizza Hut franchisees, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged.

**JURISDICTION AND VENUE**

15.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendant for the injuries sustained by Plaintiff by virtue of Defendant's violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and to enjoin further violations. The Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, under Section 4 of the Sherman Act, 15 U.S.C. § 4, and under 28 U.S.C. §§ 1331, 1332, 1337 and 1367 to prevent and restrain the Defendant from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

16.     Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391(b)(2), (c)(2).  Pizza Hut transacts or has transacted business in this district and has its principal place of business here.  Based on information and belief, a substantial part of the events that gave rise to this action occurred here, namely, the decision to implement and the drafting of the no-solicit and no-hire clause in the franchise agreements, Pizza Hut's entry into that agreement, and the selection of Texas law to interpret and govern that agreement.   In fact, Pizza Hut's standard franchise agreement states that the provisions and terms of the agreement are to be interpreted in accordance with and governed by the laws of the state of Texas.  It specifies that all litigation is to be brought in Collin County, Texas, which is in this judicial District.

17.     Pizza Hut is in the business of selling food to consumers through independently owned and operated franchise restaurants.  These restaurants are in each state in the United States, and Pizza Hut has substantial business activities with each franchised restaurant, including entering

into a contractual franchise agreement with the owner of the franchise.  Pizza Hut engages in substantial activities at issue in this Complaint that are in the flow of and substantially affect interstate commerce.

## FACTS COMMON TO ALL COUNTS

### A.    The Pizza Hut Model

18.    Pizza Hut is one of the world's largest restaurant chains, serving customers daily in more than 100 countries.[8]  Pizza Hut primarily sells pizza, though its menu includes pasta, wings, sides, drinks, and desserts.

19.    According to the Franchise Disclosure Document, Pizza Hut, either itself or through its subsidiaries and affiliates, operates and franchises Pizza Hut restaurants.    A Pizza Hut restaurant is either company-owned (meaning owned by Pizza Hut predecessor, parent and/or affiliates) or franchisee owned.   Pizza Hut's revenues come from the rent, royalties, and fees paid by the franchisees, as well as sales in its company-operated restaurants.

20.    Currently, Pizza Hut has franchised approximately 95% of its restaurants, while the remainder are owned and operated by the company. The company owns and operates approximately 686 locations.[9]

21.    Most of the company's franchisees are subject to a standard 20-year franchise license agreement.

22.    Each franchise is operated by an entity that is a separate legal entity from Pizza Hut, LLC.  Each franchise is an independently owned and independently managed business.

---

[8] http://blog.pizzahut.com/our-story/ (last visited August 23, 2017).
[9] https://www.entrepreneur.com/franchises/pizzahutllc/282696 (last visited August 22, 2017).

23.     There are approximately 350,000 employees that work for Pizza Hut or its franchise restaurants.[10]

24.     Overall, franchising is very important to Pizza Hut's profitability.  The chart below illustrates the income that Pizza Hut receives from this part of its business[11]:

**PIZZA HUT DIVISION**

| | Fourth Quarter | | | | Full Year | | | |
|---|---|---|---|---|---|---|---|---|
| | | | %/ppts Change | | | | %/ppts Change | |
| | 2016 | 2015 | Reported | Ex F/X | 2016 | 2015 | Reported | Ex F/X |
| Restaurants | 16,409 | 16,063 | +2 | NA | 16,409 | 16,063 | +2 | NA |
| System Sales Growth | | | +2 | +3 | | | Even | +2 |
| Same-Store Sales Growth (%) | (2) | Even | NM | NM | (1) | Even | NM | NM |
| Franchise & License Fees ($MM) | 196 | 189 | +4 | +5 | 617 | 605 | +2 | +4 |
| Restaurant Margin (%) | 8.5 | 9.6 | (1.1) | (1.0) | 8.3 | 9.7 | (1.4) | (1.6) |
| Operating Profit ($MM) | 118 | 100 | +19 | +21 | 370 | 347 | +7 | +9 |
| Operating Margin (%) | 36.0 | 27.0 | 9.0 | 9.3 | 33.3 | 28.5 | 4.8 | 4.7 |

25.     In Pizza Hut operated restaurants/franchises, the company develops and refines operating standards, marketing concepts, and product and pricing strategies.

26.     Pizza Hut, through its affiliate YRSG, offers various development services to franchisees such as site selection and negotiate a purchase contract or lease on the franchisee's behalf for the restaurant site.

27.     Pizza Hut's FDD and Franchise Agreement both provide that the franchisees are independent of Pizza Hut and are responsible for all employment practices, and the franchisee will "be an independent business person and will assume all business risk" associated with all operations of the business.

---

[10] http://blog.pizzahut.com/our-story/ (last visited August 23, 2017).
[11] http://www.yum.com/app/uploads/Earnings-Release-020917.pdf (last visited August 23, 2017).

28.     The Pizza Hut franchisees are contractually prohibited from engaging indirectly or directly in the business of operating restaurants that sell pizza, pasta or other similar food items or approved Pizza Hut products during the term of the franchise agreement.  Post-termination of the franchise agreement, the Pizza Hut franchisees are contractually prohibited from engaging directly or indirectly in the production or sale of foods similar to those of Pizza Hut anywhere within 25 miles of any Pizza Hut location, anywhere within the same county as a Pizza Hut location, or anywhere within 10 miles of where a franchisee or affiliate operates a system restaurant.

**B.      Pizza Hut Has Continually Sought to Cut Employee Wages and Hours**

29.     The average fast-food worker in the United States makes approximately $19,900 per year, while the average fast-food CEO earns $1.2 million per year.

30.     In 2016, the CEO of Pizza Hut made $60 for every $1 that an employee working in a Pizza Hut location earned.  Moreover, the salaries of CEO's in the United States continue to grow at a rate that is faster than any increases seen by American workers.[12]

31.     Pizza Hut also does not extend the same policies it has in place for its corporate employees to its workers.  In February of 2017, Yum! Brands announced that it would offer 18 weeks paid maternity leave, and six weeks paid paternity leave for its corporate employees, but that the policy does not extend to the tens of thousands of low-paid workers at Pizza Hut, KFC, and Taco Bell restaurants.[13]

32.     In its Australian franchises, Pizza Hut has been cited for failing to pay both delivery drivers and in-store workers the required wages under Australia's Fair Work laws.  The Fair Work Ombudsman noted that there was a "lack of any meaningful response or commitment from Pizza

---

[12] https://www.eater.com/2017/6/5/15661110/fast-food-ceo-pay (last visited Aug. 23, 2017).
[13] http://www.redlandsdailyfacts.com/2017/08/19/how-much-bonding-time-you-get-with-your-baby-is-determined-by-how-many-co-workers-you-have-is-that-fair/ (last visited Aug. 23, 2017).

Hut" and that the company had allowed "allegedly unlawful activity to spread through its network to in-store staff."[14]

33.     Hart Research Associates surveyed 1,088 fast food workers in 10 major metro areas, and found that 89% of fast food workers have experienced wage-theft, in multiple forms, at their fast food job.  Wage theft occurred through forcing employees to work off the clock, not being paid for all hours worked, denying employees breaks, and failing to pay for overtime.[15]  At one location, a Pizza Hut manager deleted employee time from the payroll for 82 employees over the course of two years, in order to save money on payroll.[16]

34.     From 2007 to 2011, fast food workers in the U.S. drew an average of $7 billion of public assistance annually because of low wages.

35.     Anonymous aggregated data, collected by *Glassdoor,* shows that Pizza Hut pays entry-level employees in the United States between $7 per hour and $13 per hour, with an average of $7.54 per hour.  Shift Managers are paid an average of $9.76 per hour.

36.     Pizza Hut workers have on occasion decided to strike over pay, with most of the employees on strike seeking to be paid $15.00.  Pizza Hut has helped franchise owners beat back union-backed strikes calling for living wages.[17]

37.     In 2014, Pizza Hut workers, with thousands of others, participated in a nationwide fast food workers' strike demanding a $15 minimum wage, which they believe reflects a livable

---

[14] http://www.smh.com.au/business/workplace-relations/pizza-hut-head-office-slammed-for-failure-to-act-on-underpayment-of-delivery-drivers-20170810-gxtcpi.html (last visited Aug. 23, 2017).

[15] http://big.assets.huffingtonpost.com/NationalWageTheftPollMemo.pdf (last visited Aug. 23, 2017).

[16] http://www.courier-journal.com/story/news/local/2017/02/24/pizza-hut-workers-sue-over-pay-dispute/97714804/ (last visited Aug. 23, 2017).

[17] https://www.glassdoor.com/Salary/Pizza-Hut-Salaries-E10090.htm (last visited Aug. 23, 2017).

wage.  Workers nationwide walked off the job, staged sit-ins, and forced some franchises to close for the day.[18]

38.     In 2016, Yum! Brands CEO, Greg Creed, earned an annual salary of $15.3 million; all while low-wage Pizza Hut workers are losing income due to wage-theft.

### C.     Plaintiff and the Putative Class Members Work as Management Employees at Pizza Hut Corporate-Operated or Franchise Restaurants

39.     Like other fast food chains in the industry, Pizza Hut restaurants maintain teams of staff in order to oversee operations and guide entry-level employees through daily responsibilities.

40.     According to the no-hire provision in the Pizza Hut Franchise Agreement, "'managerial position" means "all employees at the pay grade of restaurant manager and above."

41.     Shift manager is the first supervisory level job in the Pizza Hut career path, and duties range from scheduling, balancing books, ordering supplies, and any function that the shift manager excels at or the store's managing needs.

42.     Assistant manager is the next level of management and is responsible for assisting in the of control the store's daily operations, which includes scheduling the work shifts, ordering and conducting inventory and food supply, processing payroll, ensuring that Pizza Hut's safety codes and security polies are maintained, recruit, interview and hire qualified team members, train staff, and disciplinary action when necessary.

43.     General manager is the highest level of store management and is responsible for overseeing and controlling all of the store's daily operations.

44.     Assistant store managers and general managers usually work full-time schedules of 40 hours or more per week.

---

[18] http://www.motherjones.com/politics/2014/09/fast-food-worker-strike-civil-disobedience/ (last visited Aug. 23, 2017).

45.     Wages and salaries for employees of franchised stores are not dictated in any way by Pizza Hut, but average pay scales start out at $7.00 per hour for inexperienced shift managers and eventually rise to roughly $13.00 per hour for highly qualified or tenured shift managers.

46.     Assistant manager positions yield annual salary options slightly varied by location but usually falling between $30,000 and $50,000.

47.     Store managers generally may begin at approximately $30,000 per year and receive raises or pay increases.

48.     Each franchise is its own economic decision-maker on employment issues, so wages are not uniform among the competing franchisee stores.  Low wages, however, are consistent across the Pizza Hut empire of company and franchise-owned restaurants, and have allowed Pizza Hut's shareholders and executives, and thousands of its franchise owners, to become very wealthy while full-time, hardworking employees have to seek government benefits just to put food on their own tables.  A significant reason that gross inequity exists between Pizza Hut and franchise owners on the one hand, and their management employees on the other, is that Pizza Hut is stifling employee wages through its no-hire prohibition.

**PLAINTIFF KRISTEN ION**

49.     In 2011, Plaintiff began working for Aurora Huts, LLC, at its various Pizza Hut Stores as a shift manager in Allegheny County, and other counties located in Pennsylvania.  At all relevant times herein, Plaintiff was paid on an hourly basis.

50.     Plaintiff was hired to train as a shift manager and was promised $9/hour as her hourly wage.  However, she was only paid $7.25 per hour upon hire as shift manager.  After going through special management training, Plaintiff received a pay rate of $8.05 per hour and continued to work as a shift manager at twelve different stores owned by Aurora Huts, LLC.

51.     Plaintiff frequently covered extra shifts and would often put in 70-plus hour work weeks.

52.     Plaintiff never received a promotion, although she was promised promotions multiple times over the six years she worked there.  When she complained about her hourly rate, she was ignored.  Plaintiff would only receive a raise when she threatened to quit or provided her two-week notice.

53.     Plaintiff is still employed with Pizza Hut as a shift manager.  Her training is in Pizza Hut management, which is only valuable and transferrable within the Pizza Hut system.  The no-solicit and no-hire prohibition within the Pizza Hut franchises has prevented Plaintiff from receiving promotions and raises.

**D.     Pizza Hut's Model Is Designed to Encourage Franchise Competition With Regard to Sales**

54.     While Pizza Hut implemented policies to actively thwart competition for employees between and among it and its franchises in order to suppress management employee wages, it encouraged competition between franchises in food sales that benefitted Pizza Hut.

55.     Pizza Hut's public disclosures and agreements with Pizza Hut's franchisees emphasize that Pizza Hut's franchisees operate separately from each other and from Pizza Hut corporation.

56.     Pizza Hut's franchise agreement state that, "[Pizza Hut] and Franchisee are not and will not be considered as joint ventures, partners, or agents of each other.  Neither Franchisee nor PHLLC will have the power to bind or obligate the other except as set forth in this Agreement."[19]

---

[19]  Exhibit A at § 21.1.

57.     Pizza Hut's franchise agreements also state that the franchisee may not "directly or indirectly, individually or as a partner, joint venture, shareholder, officer, creditor, director, employee, trustee, or agent of an organization, own, operate, finance, or provide consulting services to any business. . . engaged in the business of operating restaurants (including the delivery and carryout aspects of restaurants) that sell pizza, pasta, or other food items similar to Approved Products."[20]

58.     Additionally, as a way of protecting itself from liability, Pizza Hut's franchise agreements expressly provide that "Franchisee specifically acknowledges that the relationship created by this Agreement is not fiduciary, special, or any other similar relationship, but rather is an arm's-length business relationship.  [Pizza Hut] owes Franchisee no duties except as expressly provided in this Agreement."[21]

59.     While franchisees are required to pay to Pizza Hut a percentage of gross sales revenues, franchisees are free to establish prices for all approved products sold by franchisee.

60.     A franchisee's profitability is a function of a number of inputs, including its cost of labor, which Pizza Hut specifically identifies as a franchisee operating expense.  Franchisees are required to enroll present and future managers in Pizza Hut's training programs or at least a program that is deemed the equivalent of Pizza Hut's training program, the travel cost and expense of which is borne by franchisees.

61.     Franchisees are responsible for the day-to-day operations of their restaurants, including employment matters and legal compliance.

E.     **The "No Hire" Agreement**

---

[20] *Id.* at §12.2.
[21] *Id.* at §21.1.

14

62.     While independent business owners should be encouraged to compete with each other for employees, Pizza Hut and its franchisees enter into express contractual franchise agreements, forbidding employee competition at a management level.

63.     Franchises are made available on standardized terms, so a franchisee who enters into a franchise agreement knows that the same terms it has agreed to also apply to other franchisees.

64.     The standard language in Pizza Hut's franchise agreements with all its franchisees includes an express "no-solicit" and "no-hire" provision that prohibits franchisees from hiring management employees of other Pizza Hut franchisees.

65.     The relevant provision from the Pizza Hut franchise agreement states:

> During the Term, neither PHLLC nor Franchisee may employ, directly or indirectly, any individual in a managerial position who is at the time, or was at any time during the prior 6 months, employed in a managerial position by the other party, nor may Franchisee employ, directly or indirectly, any individual in a managerial position who is at the time, or was at any time during the prior 6 months employed in a managerial position by any other franchisee of PHLLC.  This restriction will not be violated if, at the time PHLLC or Franchisee employs the individual, the current or former employer has given its written consent.  If the restrictions contained in this Section 13.2 are violated, the amount of actual damages will be difficult to determine; therefore, the former employer will be entitled to liquidated damages in an amount equal to twice the total annual compensation of the employee involved (annualized, if appropriate, to reflect the rate of compensation for a full year's employment), plus reimbursement of all costs and attorneys' fees incurred.[22]

66.     According to the standard franchise agreement, any breach of this no-hire and no-solicitation provision would give the former employer the right to liquidated damages, plus costs and attorneys' fees.

---

[22] Exhibit A, at ¶ 13.2.

67.     But for the no-hire agreement, each Pizza Hut franchisee (and Pizza Hut itself in its corporate-operated stores) is its own economic decision-maker with respect to hiring, firing, staffing, promotions and employee wages.   But for the no-hire agreement, each Pizza Hut franchisee (and Pizza Hut itself) would compete with each other for the best-performing management employees.

**F.     Other Evidence of a Horizontal Agreement among Competing Franchisees and Pizza Hut**

68.     Pizza Hut's corporate website boasts that at Pizza Hut "you can become your best, make friends and have fun built on our culture to Team Together, Believe in All People, and Recognize Great Work."[23]

69.     The potential for broader collusion in franchise chains is clearly enhanced when no-poaching agreements are in place.  Collusion is promoted when the no-poach agreements can be easily generated and monitored amongst a concentrated group of competitors who all stand to gain profits from the collusion while maintaining similar costs.

70.     Indeed, the "no-solicit" and "no-hire" agreement embodies norms that are widely accepted across the fast-food industry and familiar to franchisees.  In advising new restaurant owners on how to hire their first general manager, one industry expert instructs that, "you have to be careful that you do not earn a reputation for stealing other people's employees."

71.     Plaintiff was a direct victim of this "no-solicit" and "no-hire" provision, in that it was complied with by both independent franchise owners to prevent Plaintiff from using competition to obtain a living wage, promotion opportunities, and find comparable and/or better employment.

---

[23] http://blog.pizzahut.com/pizza-hut-experience (last visited Aug. 23, 2017).

G.      **The "No-Hire" Agreement Is Against the Independent Interests of the Franchisees**

72.     This no-hire provision is short-sighted and ultimately not in the independent franchisees' interest, even though it is in the interest of the conspirators as a whole when acting together.  Management employees are critical to the success of Pizza Hut franchisees.

73.     The sales in franchise-operated restaurants bring the most revenue to Pizza Hut, so Pizza Hut's profits hinge on the success or failure of its franchisees.  A significant component of making the franchise profitable is hiring qualified, motivated, and superior management employees.

74.     Therefore, it is in the independent interest of each Pizza Hut franchisee to compete for the most talented and experienced restaurant management employees.

75.     By adhering to the no-hire agreement, franchisees artificially restrict their own ability to hire other management employees in a manner that is inconsistent with their own unilateral economic interests.  By acting in concert, however, they also artificially protect themselves from having their own management employees poached by other franchises that see additional value in those employees, such as their training, experience and/or work ethic.  This allows franchisees to retain their best management employees without having to pay market wages to these management employees or compete in the market place relative to working conditions and promotion opportunities.

76.     The "no-hire" agreement does not serve the interests of ensuring that Pizza Hut's restaurants produce a quality product.

77.     The "no-hire" agreement does not serve management employees because it does not incentivize Pizza Hut franchisees to invest in training workers to improve Pizza Hut's food, experience and service.  It also dis-incentivizes employees to perform their best work as their opportunities from doing so are limited.  Alternatively, competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment.

78.     The "no-hire" agreement does not serve fast-food customers because it does not incentivize Pizza Hut franchisees to invest in training management workers to improve the Pizza Hut food, experience and service.

79.     Consumers can gain from competition among employers because a more competitive workforce may create more or better goods and services.  Furthermore, unemployment has reached a 16-year low and job opening are at an all-time high, yet wage growth has remained surprisingly sluggish with fast-food workers relying on public assistance to supplement their income.  Higher wages will lessen the strain on public benefits, benefiting all consumers.

### H.     Employment with Non-Pizza Hut Brands is Not a Reasonable Substitute for Pizza Hut Employees

80.     Online reviews for employment at Pizza Hut restaurants report that there was a lack of raises, that management employees feel underpaid, that the restaurants are regularly understaffed, and that the "you work for under minimum wage plus tips."[24]  That is all made possible by the "no-hire" prohibition.  If franchisees had to either pay and promote good management employees, or lose them to competitor locations, they would be forced to pay competitive wages and provide competitive promotion opportunities.  However, because of the no-hire prohibition, and because the education, training and experience within the Pizza Hut

---

[24]   https://www.glassdoor.com/Reviews/Pizza-Hut-Reviews-E10090.htm (last visited Aug. 23, 2017).

enterprise are unique to Pizza Hut and not transferrable to other restaurants, Pizza Hut franchisees do not have to compete with non-Pizza Hut businesses for their management employees and only compete for employees at the entry-level position.

81.    Training, education, and experience within Pizza Hut's system are not transferrable to other restaurants for a number of reasons.  Pizza Hut's franchises utilize Pizza Hut's own proprietary computer systems and platforms, including proprietary applications and data systems, which new franchises must pay Pizza Hut standard support and maintenance fees, and must purchase through Pizza Hut's approved suppliers and vendors.  Franchises electronically submit their store financial information to Pizza Hut via a separate proprietary web-based system, which Pizza Hut may access and retrieve, analyze, download and use all data and files stored thereon. Experience with these systems is of little value to other restaurants.[25]

82.    Pizza Hut franchises also utilize proprietary store operating procedures, Pizza Hut's bookkeeping/accounting procedures, and Pizza Hut's prescribed equipment.[26]  Training is also mandatory for Pizza Hut managers, which is accomplished through proprietary curricula and systems.  According to Pizza Hut's Franchise Agreement, the "course content, format, operation, and manner of conducting these training programs will be in the sole control of [Pizza Hut]."[27]

83.    A no-hire agreement like this one reduces managers' outside options and lowers their quit rate, increasing the share of net-returns captured by employers.  Further, a franchise-wide no-hire agreement increases the specificity of human capital investment, as training that is productive throughout the franchise chain can only be used at one franchisee under the agreement.

---

[25] See Exhibit A at § 6.11.
[26] See Exhibit A at §§ 6, 8 and 11, generally.
[27] Exhibit A at § 4.1.

84.     Because Plaintiff lacked any bargaining power due to the no-hire clause in Pizza Hut's franchise agreements, she was unable to receive promotions in status and pay.  Plaintiff will now likely have to start over at an entry-level job and salary in another industry.

## I.      **Plaintiff and the Class Members Have Suffered Antitrust Injury**

85.     Because of the "no-solicit" and "no-hire" agreement, Plaintiff and the putative class have suffered injury in the form of reduced wages and worsened working conditions.

86.     Suppressed wages due to employers' agreement not to compete with each other is injury of the type the antitrust laws were intended to prevent.

## CLASS ALLEGATIONS

87.     Plaintiff brings this action on her own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3).

Nationwide Class:

> All persons in the United States who are current or former managers at all Pizza Hut restaurants whether operated by Pizza Hut itself or by a Pizza Hut Franchisee.

88.     Alternatively, Plaintiff brings this action on her own behalf, and on behalf of a Class of Pennsylvania residents pursuant to Rule 23(a), 23(b)(2), and/or 23(b)(3).

Pennsylvania Class:

> All persons in the State of Pennsylvania who are current or former managers at all Pizza Hut restaurants whether operated by Pizza Hut itself or by a Pizza Hut Franchisee.

89.     Except where necessary to differentiate, the Nationwide Class, the Pennsylvania Class, and their members shall be referred to herein as the "Class," the "Classes" or "Class

Members."  Excluded from the Classes are Defendant Pizza Hut, its affiliates, officers and directors, and the Judge(s) assigned to this case.  Plaintiff reserves the right to modify, change, or expand the Class definitions on discovery and further investigation.

90.     Numerosity:  Upon information and belief, the Classes are so numerous that joinder of all members is impractical; there are over 16,000 Pizza Hut restaurants.  While the exact number and identities of the individual Members of the Classes are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that thousands of Class Members are the subjects of the Class.

91.     Existence and Predominance of Common Questions of Fact and Law:  Common questions of fact and law exist as to all Members of the Class.  These questions predominate over the questions affecting individual Class Members.  These common legal and factual questions include, but are not limited to, whether:

a.      Defendant engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

b.      Defendant's conduct constituted unfair competition;

c.      Defendant's conduct constituted unlawful, unfair, and fraudulent business acts and practices;

d.      Defendant violated the Sherman Antitrust Act, 15 U.S.C. §§ 1, *et seq.*;

e.      Defendant violated the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code § 15.01, *et seq.*;

f.      Defendant violated the Deceptive Trade Practices Consumer Protection Act, Tex. Bus. & Com. Code § 17.41, *et seq.*;

g.     Defendant should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

h.     Plaintiff and Class Members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

i.     The amount and nature of such relief to be awarded to Plaintiff and the Class.

92.    Typicality:  All of Plaintiff's claims are typical of the claim of the Class inasmuch as Plaintiff was a Pizza Hut franchisee restaurant manager and each Member of the Class either was or is a Pizza Hut owned or franchisee restaurant manager subject to the same agreements and rules as Plaintiff.  Further, Plaintiff and all the Members of the Class sustained the same monetary and economic injuries of being subjected to artificial suppression of compensation, wages, benefits, and growth opportunity, and the remedy sought for each is the same in which Plaintiff seeks relief against Defendant for herself and all absent Class Members.

93.    Adequacy:  Plaintiff is an adequate representative because her interest does not conflict with the interest of the Classes that she seeks to represent, she has retained counsel competent and highly experienced in complex Class Action litigation, and she intends to prosecute this action vigorously.  The interest of the Class will be fairly and adequately protected by Plaintiff and her counsel.

94.    Superiority:  A Class Action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Classes.  The injuries suffered by each individual Class Member is relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  It would be virtually impossible for members of the Classes individually to redress

effectively the wrongs done to them.  Even if the Members of the Classes could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the Class Action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, Members of the Classes can be readily identified and notified based on, inter alia, Defendant's employment records and franchisees' records.

95.    Defendant has acted, and refuses to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## CLAIMS FOR RELIEF

## <u>COUNT I: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT,</u>

## <u>15 U.S.C. § 1, *et seq*.</u>

(By Plaintiff on Behalf of the Nationwide Class and, Alternatively,

the Pennsylvania Class)

96.    Plaintiff, on behalf of herself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint, and further alleges against Defendant as follows:

97.    Beginning no later than 2013, Defendant entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

98.    Defendant engaged in predatory and anticompetitive behavior by restricting competition among business franchisees, which unfairly suppressed management employee wages, and unreasonably restrained trade.

99.     Defendant's conduct included concerted efforts, actions and undertakings among the Defendant and franchisee owners with the intent, purpose and effect of: (a) artificially suppressing the compensation of Plaintiff and Class Members; (b) eliminating competition among Defendant and franchise owners for skilled labor; and (c) restraining management employees' ability to secure better compensation, advancement, benefits, and working conditions.

100.    Defendant perpetuated the scheme with the specific intent of lowering its costs to the benefit of Defendant and franchise owners.

101.    Defendant's conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by its respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

102.    Plaintiff and Class Members have received lower compensation from Defendant and independent franchise businesses than they would otherwise would have received in the absence of Defendant's unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

103.    Defendant's contracts, combinations, and/or conspiracies are per se violations of Section 1 of the Sherman Act.

104.    In the alternative, Defendant is liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

105.    Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

106.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to

their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

107.    Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Sherman Act alleged herein.

## COUNT II: VIOLATIONS OF THE TEXAS FREE ENTERPRISE AND ANTITRUST ACT OF 1983, Tex. Bus. & Com. Code § 15.01, *et seq.*

(By Plaintiff on Behalf of the Nationwide Class and, Alternatively,

the Pennsylvania Class)

108.    Plaintiff, on behalf of herself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint, and further alleges against Defendant as follows:

109.    Defendant is a person as is defined by the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code § 15.03.

110.    Defendant engaged in unlawful contracts, combinations, and/or conspiracies in restraint, trade or commerce in violation of the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code § 15.05.

111.    As alleged above, Defendant engaged in predatory and anticompetitive behavior to not solicit restaurant-based managers from other Pizza Hut restaurants by requiring franchisees to enter into no-hire agreements.  The no-hire agreements were unknown to management workers and were not an agreement involving traditional labor disputes traditionally subject to state and federal labor laws.

112.    Defendant's specific intent has been to substantially lessen competition in the market for manager positions among Pizza Hut restaurants, to limit the compensation, benefits,

and opportunities for such positions, and to restrain the provision of services and labor of restaurant-based managers.

113.    A substantial amount of trade and commerce has been affected and will continue to be affected, in the market for Pizza Hut managers as a result of Pizza Hut's unreasonable and unlawful conduct.

114.    A substantial portion of Defendant's behavior constituting the violations alleged above occurred in the State of Texas and has had a substantial impact of trade or commerce within the State of Texas.

115.    As alleged above, Defendant's contract, combination, and/or conspiracy constitutes unreasonable restraints on trade and commerce, all of which are per se violations of the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code § 15.01, *et seq*. or in the alternative, violations under the rule of reason.

116.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

117.    Given the express language of the no-hire agreements, Defendant's restraint of trade is willful and flagrant.

118.    Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Texas Free Enterprise and Antitrust Act of 1983 alleged herein pursuant to Tex. Bus. & Com. Code § 15.21(a)(1).

119.    Plaintiff and the Class Members also seek to temporary and permanent injunctive relief pursuant to Tex. Bus. & Com. Code § 15.21(b) given the ongoing threatened injury to

Plaintiff's and the Class Members' business or property and continued deprivation of the benefit of free and fair competition.

120.    Notice of this suit has been delivered to the Attorney General of Texas in accordance with Tex. Bus. & Com. Code § 15.21(c).

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and Members of the Class, requests that this Court:

A.    determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.    appoint Plaintiff as the representative of the Class and her counsel as Class Counsel;

C.    declare that Defendant's actions as set forth in this Complaint violate the law;

D.    award Plaintiff and the Class damages in an amount according to proof against Defendant for Defendant's violations of 15 U.S.C. §1, to be trebled in accordance with those laws;

E.    award Plaintiff and the Class damages in an amount according to proof against Defendant for Defendant's violations of Tex. Bus. & Com. Code § 15.01, *et seq.*, to be trebled in accordance with those laws;

F.    award Plaintiff and the Class damages in an amount according to proof against Defendant for Defendant's violations of Tex. Bus. & Com. Code § 17.41, *et seq.*, to be trebled in accordance with those laws;

G.     award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class Members are entitled;

H.     grant equitable relief, including a judicial determination of the rights and responsibilities of the parties;

I.     grant a permanent injunction enjoining Defendant from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

J.     declare Defendant be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for management employees except as prescribed by this Court;

K.     grant judgment against Defendant and in favor of Plaintiff and each Member of the Class she represents, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them and/or imposing a constructive trust upon Defendant's ill-gotten gains, freezing Defendant's assets, and/or requiring Defendant to pay restitution to Plaintiff and to all Members of the Class of all funds acquired by means of any act or practice declared by this Court to be unlawful, unfair, or fraudulent;

L.     declare Defendant to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class Members;

M.     award pre-judgment and post-judgment interest on such monetary relief;

N.     award reasonable attorneys' fees and costs; and

O.     grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Date:   November 3, 2017                    Respectfully Submitted,

**STECKLER GRESHAM COCHRAN PLLC**

*/s/ Bruce W. Steckler*
Bruce W. Steckler
Texas Bar No. 00785039
L. Kirstine Rogers
Texas Bar No. 24033009
12720 Hillcrest Road – Suite 1045
Dallas, TX  75230
Telephone:  972-387-4040
Facsimile:  972-387-4041
bruce@stecklerlaw.com
krogers@stecklerlaw.com


**MCCUNE WRIGHT AREVELO, LLP**

Richard D. McCune*
California State Bar No. 132124
Michele M. Vercoski*
California State Bar No. 244010
3281 E. Guasti Road, Suite 100
Ontario, CA  91761
Tel: (909) 557-1250
Fax: (909) 557-1275
rdm@mccunewright.com
mmv@mccunewright.com

Derek Y. Brandt*
Illinois State Bar No. 6228895
P.O. Box 487
Edwardsville, IL 62025
Tel: (618) 307-6116
Fax: (618) 307-6161
dyb@mccunewright.com

Joseph G. Sauder*
Pennsylvania State Bar No. 82467
555 Lancaster Avenue
Berwyn, PA 19312
Tel: (610) 200-0339
Fax: (610) 727-4360
jgs@mccunewright.com

*Pro Hac Vice Application to be Submitted

Attorneys for Plaintiff and the Putative Class