**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| KRISTEN ION, on behalf of herself and all others similarly situated, | ) ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 4:17-CV-00788-ALM-KPJ |
| | ) |
| PIZZA HUT, LLC, a Delaware limited liability company, | ) Jury Trial Demanded ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, KRISTEN ION, on behalf of herself and all others similarly situated, with knowledge as to her own actions and events, and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE ACTION

1.      This action challenges under Section 1 of the Sherman Act an employee no-poach and no-hiring agreement orchestrated by Defendant Pizza Hut, LLC ("Defendant" or "Pizza Hut") between and among Pizza Hut restaurant franchisees, pursuant to which the franchisees agreed not to poach or hire each other's management employees.  Pizza Hut, at its principal place of business located in Plano, Texas, orchestrated, designed, monitored, and enforced this anti-competitive contract, combination, or conspiracy.  Pizza Hut orchestrated, dispersed, and enforced what it labels the "Employee Piracy" policy among all franchisees, at least in part, through explicit contractual agreements (and remedies for violation) in standard Pizza Hut franchise documents.

The practice at issue reflects a naked restraint of competition and a per se violation of the antitrust laws.

2.       Pizza Hut is the largest pizza company in the world with over 16,000 restaurants worldwide.[1]  More than 95% of Pizza Hut's restaurants worldwide are franchise businesses that are independently owned and operated, and are separate and distinct entities from Pizza Hut.[2]

3.       Plaintiffs are current and former management employees of Pizza Hut franchise restaurants. Plaintiffs suffered reduced wages and benefits and diminished employment opportunities as a result of the unlawful contract, combination, or conspiracy alleged herein.

4.       Pizza Hut boasts on its website that "[its] goal is to make everyone proud to work at Pizza Hut.  That means encouraging them to be the best version of themselves and making the work environment friendly and fun."[3] The website of Pizza Hut's ultimate parent, Yum! Brands, attributes Pizza Hut's success to its "tried and true service principles." It says "All of this is made possible by unlocking the potential of our team members. We promise that at Pizza Hut you can become your best, make friends and have fun. Because we're the pizza company that lives life unboxed."[4]

5.       But as part of the system that has made Pizza Hut the largest pizza company in the world, Pizza Hut franchisees, at the direction of and with the assistance of Pizza Hut itself, have together colluded to suppress the wages and employment opportunities of the restaurant-based management employees who work at Pizza Hut franchise locations throughout the United States.

---

[1] http://franchise.pizzahut.com/why-us/ (last visited August 22, 2017);
https://www.entrepreneur.com/franchises/pizzahutllc/282696 (last visited August 22, 2017).
[2] https://www.entrepreneur.com/franchises/pizzahutllc/282696 (last visited August 22, 2017).
[3] http://franchise.pizzahut.com/culture/ (last visited August 22, 2017).
[4] http://www.yum.com/company/our-brands/pizza-hut/ (last visited February 27, 2018).

6.      In particular, Pizza Hut franchisees have contracted, combined, and/or conspired to not poach each other's management employees. This agreement is evidenced by franchisees' written pledge in their franchise agreements to not:

> employ, directly or indirectly, any individual in a managerial position who is at the time or was at any time during the prior 6 months employed in a managerial position by any other franchisee of [Pizza Hut].[5]

7.      Each franchisee has agreed that all other franchisees are "intended beneficiaries of Section 13 of" the franchise agreement, i.e., the above-quoted pledge.[6]

8.      Each franchisee also has agreed to onerous remedies for any violation of the agreement evidenced by this no-poach language. In the event of violation, franchisees have agreed "the former employer will be entitled to liquidated damages in an amount equal to twice the total compensation of the employee involved (annualized, if appropriate, to reflect the rate of compensation for a full year's employment), plus reimbursement of all costs and attorneys' fees incurred."[7] In addition, Pizza Hut may terminate the franchise of a franchisee who violates the no-poach provision on 3 or more occasions in any 12-month period, or on 5 or more occasions in any 36-month period, triggering forfeit of the franchisee's $25,000 franchise fee, along with other post-termination provisions.[8]

9.      The Pizza Hut no-hire agreement is an unreasonable restraint of trade.

10.     As the Department of Justice (DOJ) Antitrust Division and Federal Trade Commission's joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly

---

[5] Section 13.2 of Franchise Agreement, 2017, attached hereto as Exhibit A.
[6] Exhibit A, Section 21.3.
[7] Exhibit A, Section 13.2.
[8] Exhibit A, Sections 18, 19.

or through a third party intermediary, are per se illegal under the antitrust laws."[9]  The DOJ/FTC *Guidance* elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services. It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[10]

11.     The no-poaching agreement between and among Pizza Hut franchisees has eliminated franchisees' incentives and ability to compete for management employees and has restricted management employees' mobility.  Far from operating "unboxed," or from "unlocking the potential of [restaurant] team members," this agreement instead has harmed management employees by lowering salaries and benefits employees otherwise would have commanded in a competitive marketplace and has deprived employees of better job growth opportunities.

12.     The no-poaching agreement—or, as Pizza Hut calls it, the "Employee Piracy" agreement—had and has the purpose of restricting competition for labor and had and has the intended and actual effect of fixing and suppressing manager compensation and restricting manager employment mobility. The no-poaching agreement between and among Pizza Hut franchisees is a naked restraint of trade that is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1. As the orchestrator of the unlawful agreement, Pizza Hut bears *per se* liability therefor.

### THE PARTIES

13.     Plaintiff KRISTEN ION ("Plaintiff") is a resident of Allegheny County, Pennsylvania.  Since 2011, Plaintiff has been a management employee of Aurora Huts, LLC,

---

[9] Available at https://www.justice.gov/atr/file/903511/download (last visited Sept. 17, 2017).
[10] *Id.*

which owned and operated the Pizza Hut franchise store located at 12330 Perry Highway, Suite 280, Wexford, Pennsylvania.

14.     Plaintiff has suffered reduced wages and inhibited employment opportunities due to the Pizza Hut no-hire agreement.

15.     Defendant Pizza Hut, LLC is a Delaware limited liability company with its principal place of business in Plano, Texas. Pizza Hut is in the business of selling food to customers primarily through independently owned and operated franchise restaurants.  It has multiple franchise restaurants in Texas, Pennsylvania, and every state in the United States. It may be served through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

16.     Pizza Hut is a wholly-owned subsidiary of its ultimate corporate parent, Yum! Brands, Inc., which is a North Carolina corporation with its principal executive offices in Louisville, Kentucky. Yum! Brands also operates the Kentucky Fried Chicken (KFC) and Taco Bell brand quick service restaurants. KFC and Taco Bell also are franchise businesses.

## CO-CONSIPRATORS

17.     Various other corporations and persons not made defendants in this Complaint, including Pizza Hut franchisees, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged.

## JURISDICTION AND VENUE

18.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendant for the injuries sustained by Plaintiff by virtue of Defendant's violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and to enjoin further violations. The Court has

subject matter jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, under Section 4 of the Sherman Act, 15 U.S.C. § 4, and under 28 U.S.C. §§ 1331, 1332(d), and 1337 to prevent and restrain the Defendant from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

19.    Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391(b)(2), (c)(2).  Pizza Hut transacts or has transacted business in this district and has its principal place of business here.  Based on information and belief, a substantial part of the events that gave rise to this action occurred here, including the decision to implement, orchestrate, or put or maintain in place, the no-poaching agreement evidenced by an explicit clause in Pizza Hut franchisees' franchise agreements.  In addition, Pizza Hut's standard franchise agreement states that the provisions and terms of the agreement are to be interpreted in accordance with and governed by the laws of the state of Texas. It specifies that all litigation is to be brought in Collin County, Texas, which is in this judicial District.

20.    Pizza Hut is in the business of selling food to consumers through independently owned and operated franchise restaurants.  These restaurants are in each state in the United States, and Pizza Hut has substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the owner of the franchise.  Pizza Hut engages in substantial activities at issue in this Complaint that are in the flow of and substantially affect interstate commerce.

## FACTUAL ALLEGATIONS

21.    Pizza Hut franchisees compete with each other. In a properly functioning and lawfully competitive labor market, Pizza Hut franchisees would openly compete for labor,

including manager employees, by soliciting current employees of one or more other franchisees (i.e., attempting to "poach" other franchisees' managers). A properly functioning market would involve "cold calling": the practice by which a prospective employer freely communicates with prospective employees—even if the employee does not first express interest.

22.     For instance, if Franchise A believes that a certain manager performs her job well at Franchise B, then Franchise A would be free to contact that manager about an employment opportunity. Conversely, if a manager employed by Franchise B perceives Franchise A to be a better organization—whether because of increased wages, better benefits, or otherwise—then the manager would be free to communicate with Franchise A about potential employment.

23.     Poaching and cold-calling are thus important aspects of a lawfully competitive labor market. Companies perceive other, rival companies' current employees, especially those who are not actively seeking other employment, in a more favorable way. This is true at least in part because companies value satisfied employees who are good at their jobs, leading them to perceive a rival company's current employees as more qualified, harder working, and more stable than those candidates who are unemployed or who are actively seeking employment. Thus, a company seeking to hire a new employee will lessen the risks associated with that hire by seeking to hire a rival's employee. The Pizza Hut no-poach agreement inhibits such lateral hiring of current employees because, unless Franchise B grants permission, Franchise A cannot hire Franchise B's current (or recent) manager employee. Franchise A can only do so once the employee has been separated from Franchise B for more than six months, at which time the employee likely will be viewed by Franchise A as less valuable. Cold-calling and poaching are thus useful and key competitive tools for companies seeking to recruit employees, particularly employees with unique skills.

24.     No-poaching agreements significantly impact employee compensation. For example, an employee of Franchise B will lack information regarding Franchise A's pay packages unless cold calling and open communications are permitted; without such information, the employee lacks leverage when negotiating with Franchise B. Similarly, unconstrained by a no-poaching agreement, if an employee of Franchise B receives an offer of higher compensation from Franchise A, the employee can either accept Franchise A's offer or attempt to negotiate a pay increase with Franchise B. Either way, the employee's compensation increases.

25.     An employee of Franchise B who receives information regarding potential compensation from a rival employer will also likely inform other Franchise B employees. These Franchise B employees can then also use that information to negotiate pay increases or move to another employer—even if they do not receive a cold call.

26.     Increased mobility combined with increased information and transparency regarding compensation levels tends to increase compensation across all current employees in the labor market. After all, there is pressure amongst rival employers to match or exceed the highest compensation package offered by rivals in order to gain and retain skilled labor. Further, the possibility of losing talent to a rival means companies will take steps to reduce the risks of poaching by assuring that employees are not undercompensated.

27.     In a properly functioning and lawfully competitive labor market, Pizza Hut franchisees would also openly compete for labor by hiring those qualified manager employees of competing franchises who seek out employment with other franchises.

28.     The beneficial effects of competition (and beneficial effects on compensation) are not, however, limited to those particular individuals who receive cold calls or who wish to speak

to a rival company about an employment opportunity. The effects instead impact all similarly situated employees because of the effect on information flow and on competition for labor.

29.     For all these reasons, the principle of free competition applies to the labor market as well as to trade.  "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers," says Joseph Harrington, Wharton professor of business economics and public policy, in his description of a no-poaching agreement.

30.     According to Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, a no-poaching agreement is unfair to employees and such a pact "benefits the companies at the expense of their employees."  Mr. Cappelli notes that the reason such agreements are illegal and violate both anti-trust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."

31.     The collusion of employers to refrain from hiring each other's employees restricts employee mobility.  This raises employers' power in the market at the expense of employees and diminishes employee bargaining power.  This is especially harmful to management employees of Pizza Hut franchise restaurants as those employees are frequently paid below a living wage,[11] and the marketable skills they acquire through their work at Pizza Hut restaurants primarily have value only to other Pizza Hut restaurants and do not transfer to other fast food restaurants or similar businesses. In addition, widespread use of no-poach agreements within the franchise industry at

---

[11] In 2014, the average hourly wage of fast food employees is $9.09 or less than $19,000 per year for a full time worker. The poverty level of a family of four in the U.S. is $23,850.  Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack,* CNN Money (May 20, 2014) http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited August 14, 2017).

large effectively reduces the number of competitive employers in a market to no more than the number of franchise companies. No-poach agreements have anti-competitive impact in labor markets analogous to that of mergers in product markets.

32.     Although unemployment in the United States is currently very low, wage growth has been slow. A decade removed from the Great Recession, wage growth has remained stuck below 3 percent.[12] A growing number of commentators have identified proliferating employer no-poaching agreements—including those used within franchise systems—and dubious employee non-compete agreements as significant contributors to this stagnant wage growth.[13]

33.     The United States DOJ has pursued and resolved civil antitrust investigations relating to no-poach agreements made between or among employers. In 2010, DOJ settlements with six high-tech employers prohibited those companies from engaging in anticompetitive no-solicitation agreements relating to their employees on a going-forward basis.

34.     On November 21, 2017, United States Senators Cory Booker and Elizabeth Warren wrote to Attorney General Jeff Sessions, asking the AG to respond to questions about DOJ's approach to addressing the anti-competitive effects of proliferating no-poach agreements in the franchise context in particular.

35.     In January 2018, DOJ antitrust chief and Assistant Attorney General Makan Delrahim disclosed that the DOJ Antitrust Division is presently pursuing a number of *criminal*

---

[12] *See* https://www.marketplace.org/2018/02/02/economy/here-truth-about-wages-you-won-t-hear-trump (last visited February 28, 2018).

[13] *See*, *e.g.*, Rachel Abrams, *Why Aren't Paychecks Growing? A Burger Joint Clause Offers a Clue*, New York Times (Sept. 27, 2017) available at https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html (last visited Feb. 28, 2018); Alan B. Krueger and Eric Posner, *Opinion: Corporate America Is Suppressing Wages For Many Workers*, New York Times (Feb. 28, 2018), available at https://www.nytimes.com/2018/02/28/opinion/corporate-america-suppressing-wages.html (last visited Feb. 28, 2018).

cases relating to employer no-hire agreements. As noted above, DOJ treats such agreements as *per se* unlawful under Section 1 of the Sherman Act.

***The Pizza Hut System***

36.     Pizza Hut is one of the world's largest restaurant chains, serving customers daily in more than 100 countries.[14]  Pizza Hut primarily sells pizza, though its menu includes pasta, wings, sides, drinks, and desserts. Pizza Hut has been in existence since 1958. It has operated as a franchisor since 1959.

37.     According to Pizza Hut's Franchise Disclosure Document (FDD), Pizza Hut restaurants are owned and operated either by Pizza Hut itself (or its predecessor or affiliates), or by franchisees.  Pizza Hut's revenues come from the rent, royalties (currently 6% of gross sales), and franchise fees paid by the franchisees, as well as sales in its company-operated restaurants.

38.     Currently, nearly 6,000 Pizza Hut U.S. restaurants (approximately 95% of Pizza Hut U.S. restaurants) are franchisee-owned and operated. Approximately 350 U.S. stores are owned and operated by the company.[15]

39.     Most of the company's franchisees are subject to a standard 20-year franchise license agreement. The initial Pizza Hut franchise fee is currently $25,000.

40.     Each franchise is operated by an entity that is a separate legal entity from Pizza Hut.  Each franchise is an independently owned and independently managed business.

41.     Pizza Hut restaurants employ hundreds of thousands of workers at franchise restaurants in the United States.[16]

---

[14] http://blog.pizzahut.com/our-story/ (last visited August 23, 2017).
[15] https://www.entrepreneur.com/franchises/pizzahutllc/282696 (last visited August 22, 2017).
[16] http://blog.pizzahut.com/our-story/ (last visited August 23, 2017).

42.   Overall, franchising is very important to Pizza Hut's profitability.  The chart below illustrates the income that Pizza Hut receives from this part of its business[17]:

### PIZZA HUT DIVISION

| | Fourth Quarter | | | | Full Year | | | |
| | | | %/ppts Change | | | | %/ppts Change | |
| | 2016 | 2015 | Reported | Ex F/X | 2016 | 2015 | Reported | Ex F/X |
|---|---|---|---|---|---|---|---|---|
| Restaurants | 16,409 | 16,063 | +2 | NA | 16,409 | 16,063 | +2 | NA |
| System Sales Growth | | | +2 | +3 | | | Even | +2 |
| Same-Store Sales Growth (%) | (2) | Even | NM | NM | (1) | Even | NM | NM |
| Franchise & License Fees ($MM) | 196 | 189 | +4 | +5 | 617 | 605 | +2 | +4 |
| Restaurant Margin (%) | 8.5 | 9.6 | (1.1) | (1.0) | 8.3 | 9.7 | (1.4) | (1.6) |
| Operating Profit ($MM) | 118 | 100 | +19 | +21 | 370 | 347 | +7 | +9 |
| Operating Margin (%) | 36.0 | 27.0 | 9.0 | 9.3 | 33.3 | 28.5 | 4.8 | 4.7 |

43.   Like other fast food chains in the industry, Pizza Hut restaurants maintain teams of staff in order to oversee operations and guide entry-level employees through daily responsibilities.

44.   Specific job titles falling under the category of "management" may include shift managers, assistant managers, and general managers.  Shift manager is the first supervisory level job in the Pizza Hut career path, and duties range from scheduling, balancing books, ordering supplies, and any function that the shift manager excels at or the store's managing needs.  Assistant manager is the next level of management and is responsible for assisting in the of control the store's daily operations, which includes scheduling the work shifts, ordering and conducting inventory and food supply, processing payroll, ensuring that Pizza Hut's safety codes and security polies are maintained, recruit, interview and hire qualified team members, train staff, and disciplinary action when necessary.  General manager is the highest level of store management and is responsible for overseeing and controlling all of the store's daily operations.

---

[17] http://www.yum.com/app/uploads/Earnings-Release-020917.pdf (last visited August 23, 2017).

45.     Assistant store managers and general managers usually work full-time schedules of 40 hours or more per week.

46.     Wages and salaries for employees of franchised stores are not dictated by Pizza Hut, but average pay scales start out at $7.00 per hour for inexperienced shift managers and eventually rise to roughly $13.00 per hour for highly qualified or tenured shift managers.

47.     Assistant manager positions yield annual salary options slightly varied by location but usually falling between $30,000 and $50,000.

48.     Store managers generally may begin at approximately $30,000 per year and receive raises or pay increases.

### *Pizza Hut Franchisees: Independent Restaurant Owners Competing With One Another*

49.     Each franchise is operated by an entity that is a separate legal entity from Pizza Hut. Each franchise is an independently owned and independently managed business.

50.     Pizza Hut's FDD informs prospective franchisees that "You will be an independent business person and will assume all business risk associated with operating a System Restaurant." The Pizza Hut franchise agreement provides that "Franchisee will be solely responsible for all of Franchisee's employment practices, including hirings, terminations, and other personnel actions."[18]

51.     Pursuant to the Pizza Hut franchise agreement, Pizza Hut and franchisees operate as independent contractors as to each other. The franchise agreement specifies: "[Pizza Hut] and Franchisee are not and will not be considered as joint venturers, partners, or agents of each other. Franchisee specifically acknowledges that the relationship … is an arm's-length business relationship." Franchisees have no general power to bind or obligate Pizza Hut.[19]

---

[18] Exhibit A, Section 13.1.
[19] Exhibit A, Section 21.1.

52.     Franchisees are responsible for day-to-day operations, including employment matters and legal compliance.

53.     Pizza Hut franchise restaurants compete with each other. The Pizza Hut FDD specifically discloses "You may face competition from other franchisees…."

54.     The Pizza Hut franchise agreement allows the franchisee, "in its sole discretion," to establish prices for all menu items.[20] Franchisees may thus compete on price terms for Approved Products (i.e., menu items).

55.     The Pizza Hut franchise is for a restaurant at a specified location, and not for a region or a territory.[21] The FDD informs prospective franchisees "YOU WILL NOT BE GRANTED ANY EXCLUSIVE TERRITORY." According to the FDD, Pizza Hut agrees only not to open (or to allow another franchisee to open) a System Restaurant within 500 yards of the franchisee's restaurant. Despite this "limited" territorial protection, Pizza Hut warns franchisees

> You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that [Pizza Hut] (or its subsidiaries) owns, or from other channels of distribution or competitive brands that [Pizza Hut] controls. Except as described above [the 500-yard zone] you will not have any right to exclude development of concepts owned or licensed by [Pizza Hut] or its affiliates. [Pizza Hut] and its subsidiaries and affiliates may develop and operate, or may franchise or license to others to operate, any other business concepts (i.e., any concept except a System Restaurant) at any place, including immediately adjacent to your System Restaurant(s), and may use the Pizza Hut Marks or any other trademarks owned or developed by [Pizza Hut] or its affiliates in connection with those concepts, even if those other concepts sell products that are the same as, or similar to, [Pizza Hut] Approved Products. You have no right to acquire additional franchises.

56.     The Pizza Hut franchise agreement, too, refers only to a 500-yard "Protected Radius," within which no System Restaurant will be allowed. Notwithstanding this, franchisees agree that they have "no exclusivity and no rights to exclude development of concepts owned,

---

[20] Exhibit A, Section 6.12.
[21] Exhibit A, Section 2.1; *see also* Section 1.15.

franchised or licensed by [Pizza Hut] or its Affiliates. [Pizza Hut] and its affiliates may develop and operate, or may franchise and license others to operate, any business concept <u>except</u> the System Restaurant concepts at any place, including immediately adjacent to the Location(s), and may use the Pizza Hut marks or any other trademarks owned or developed by [Pizza Hut] or its Affiliates in connection with those concepts, even if such concepts sell products that are the same as, or similar to, Approved Products."[22]

### The Agreement Not to Compete for Management Employees

57.     Notwithstanding that each franchisee is an independently owned and operated businesses that competes with other franchisees, and notwithstanding that each (ostensibly) is "solely responsible" for all of its "employment practices, including hirings, terminations, and other personnel actions," Pizza Hut franchisees have agreed not to compete with each other with respect to manager hiring. This agreement is evidenced by and memorialized in explicit contractual terms contained in franchisees' Pizza Hut franchise agreements.

58.     In particular, the franchise agreement memorializes that franchisees have agreed not to "employ, directly or indirectly, any individual in a managerial position who is at the time, or was at any time during the prior 6 months employed in a managerial position by any other franchisee of [Pizza Hut]."[23] The restriction contains a safe harbor "if, at the time … Franchisee employs the individual, the current or former employer has given its written consent."[24]

59.     The Pizza Hut franchise agreement contains a section entitled "Third-Party Beneficiaries."[25] That section confirms that even though "[n]othing else in [the franchise]

---

[22] Exhibit A, Section 2.6 (emphasis in original).
[23] Exhibit A, Section 13.2. The Pizza Hut Section 13.2 no-poaching agreement separately applies as between franchisees and Pizza Hut itself. Plaintiff's claim, however, addresses the agreement as between franchisees.
[24] *Id.*
[25] Exhibit A, Section 21.3.

Agreement is intended to confer any rights or remedies upon any Person or legal entity not a party to [the] Agreement," franchisees specifically agree that "[t]he other franchisees of [Pizza Hut] are intended beneficiaries of Section 13 of [the] Agreement." That is, franchisees agree that all other franchisees are intended third-party beneficiaries of the provision memorializing their agreement to not poach managers from other franchises.

60.     Pursuant to the provision memorializing their no-poach agreement, franchisees also agree that if there is a violation, "the former employer will be entitled to liquidated damages in an amount equal to twice the total annual compensation of the employee involved (annualized, if appropriate, to reflect the rate of compensation for a full year's employment), plus reimbursement of all costs and attorneys' fees incurred."[26]

61.     In addition, if any franchisee violates the provision memorializing the no-poach agreement on 3 or more occasions in any 12-month period, or on 5 or more occasions in any 36-month period, the franchisee can be adjudged in "Habitual Default" and its franchise can be terminated.[27]

62.     Pizza Hut franchises, like other franchises, are made available on standardized terms. So a franchisee who enters into a Pizza Hut franchise agreement knows that the same terms it has agreed to also apply to other franchisees.

63.     One of the standard terms in Pizza Hut's franchise agreements with all its franchisees no-poach provision referred to above.

---

[26] Exhibit A, Section 13.2.
[27] Exhibit A, Sections 18.1(G), 18.2.

64.     Pizza Hut's FDD also includes a list of all Pizza Hut franchisees, organized by state, city, and street address. Franchisees thus know that these entities are the third-party beneficiaries of the no-poach agreement memorialized in the franchise agreement.

65.     This no-hire agreement among Pizza Hut franchisees is short-sighted and ultimately not in the franchisees' independent interest, even though it is in the interest of the conspirators as a whole when acting together.

66.     The no-hire agreement does not serve the interests of ensuring that Pizza Hut's restaurants produce a quality product.

67.     The no-hire agreement does not serve fast-food customers because it does not incentivize Pizza Hut franchisees to invest in training management workers to improve the Pizza Hut food, experience, and service.

68.     Consumers can gain from competition among employers because a more competitive workforce may create more or better goods and services.  Further, unemployment is at record lows, yet wage growth has remained sluggish. Fast-food workers regularly rely on public assistance to supplement their income.  Higher wages would lessen the strain on public assistance, benefiting all consumers.

69.     The no-hire agreement is not in the independent interest of Pizza Hut franchisees if acting unilaterally. Management employees are critical to the success of Pizza Hut franchises. A significant component of making the franchise profitable is hiring qualified, motivated, and superior employees.

70.     Therefore, it is in the independent interest of each Pizza Hut franchisee to compete for the most talented and experienced restaurant management employees.

71.     By adhering to the no-hire agreement, franchisees artificially restrict their own ability to hire management employees in a manner that is inconsistent with their own unilateral economic interests.  By acting in concert, however, they also protect themselves from having their own management employees poached by other franchises that see additional value in those employees, such as their training, experience and/or work ethic.  This allows franchisees to retain their best management employees without having to pay market wages to these management employees or compete in the market place relative to working conditions and promotion opportunities.

72.     Most importantly, the no-hire agreement does not serve franchisee management employees because it does not incentivize franchisees to invest in higher wages, benefits, and improved working conditions, i.e., to compete for their labor.  It also dis-incentivizes employees to perform their best work as those efforts are not rewarded commensurately. Competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment.

73.     Pizza Hut franchisees have a shared interest, however, in keeping labor costs low. As noted above, franchisees pay to Pizza Hut royalties based on a percentage of gross sales. Cost of labor therefore has a direct impact on franchisee profitability. By agreeing to not compete for management labor, they act against their unilateral self-interest, but serve their shared interest.

74.     But for the no-poach agreement, each Pizza Hut franchise is its own economic decision-maker with respect to hiring, firing, staffing, promotions and employee wages. But for the no-poach agreement, each Pizza Hut franchise would compete with each other for the best-performing employees.

***Other Evidence of Pizza Hut's System-Wide Commitment to Suppressing Employee Wages and Mobility and of the Unlawful Agreement***

75.     Low wages are consistent, even if not uniform, across the Pizza Hut system. This has allowed Pizza Hut's owners and executives, and Pizza Hut franchisees, to become wealthy while full-time, hardworking employees often must resort to government benefits just to put food on their own tables.  A significant reason for this is that Pizza Hut has orchestrated an agreement among franchisees to stifle employee wages and mobility.

76.     The average fast-food worker in the United States makes approximately $19,900 per year, while the average fast-food CEO earns $1.2 million per year.

77.     In 2016, the CEO of Pizza Hut made $60 for every $1 that an employee working in a Pizza Hut location earned. That same year, Yum! Brands CEO Greg Creed earned a salary of $15.3 million. CEO salaries in the United States continue to grow at a rate that is faster than any increases seen by American workers.[28]

78.     Pizza Hut also does not extend the same policies it has in place for its corporate employees to franchise restaurant workers.  In February of 2017, Yum! Brands announced that it would offer 18 weeks paid maternity leave, and six weeks paid paternity leave for its corporate employees, but that the policy does not extend to the tens of thousands of low-paid workers at Pizza Hut, KFC, and Taco Bell restaurants.[29]

79.     In its Australian franchises, Pizza Hut has been cited for failing to pay both delivery drivers and in-store workers the required wages under Australia's Fair Work laws.  The Fair Work Ombudsman noted that there was a "lack of any meaningful response or commitment from Pizza

---

[28] https://www.eater.com/2017/6/5/15661110/fast-food-ceo-pay (last visited Aug. 23, 2017).
[29] http://www.redlandsdailyfacts.com/2017/08/19/how-much-bonding-time-you-get-with-your-baby-is-determined-by-how-many-co-workers-you-have-is-that-fair/ (last visited Aug. 23, 2017).

Hut" and that the company had allowed "allegedly unlawful activity to spread through its network to in-store staff."[30]

80.     Pizza Hut employee online reviews report a lack of raises, management employees being underpaid, restaurants being understaffed, and that the "you work for under minimum wage plus tips."[31]  That is all made possible by the no-hire agreement.  If franchisees had to either pay and promote good management employees, or lose them to competitor locations, they would be forced to pay competitive wages and provide competitive promotion opportunities.  However, because of the no-hire agreement, and because the education, training and experience within the Pizza Hut system are unique to Pizza Hut and not transferrable to other restaurants, Pizza Hut franchisees do not have to compete with other Pizza Hut franchisees, and do not have to compete with non-Pizza Hut businesses for their management employees except at the entry-level position.

81.     Hart Research Associates surveyed 1,088 fast food workers in 10 major metro areas, and found that 89% of fast food workers have experienced wage-theft, in multiple forms, at their fast food job.  Wage theft occurred through forcing employees to work off the clock, not paying workers for all hours worked, denying breaks, and failing to pay for overtime.[32]  At one location, a Pizza Hut manager deleted employee time from the payroll for 82 employees over the course of two years, in order to save money on payroll.[33]

---

[30] http://www.smh.com.au/business/workplace-relations/pizza-hut-head-office-slammed-for-failure-to-act-on-underpayment-of-delivery-drivers-20170810-gxtcpi.html (last visited Aug. 23, 2017).
[31]  https://www.glassdoor.com/Reviews/Pizza-Hut-Reviews-E10090.htm (last visited Aug. 23, 2017).
[32] http://big.assets.huffingtonpost.com/NationalWageTheftPollMemo.pdf (last visited Aug. 23, 2017).
[33] http://www.courier-journal.com/story/news/local/2017/02/24/pizza-hut-workers-sue-over-pay-dispute/97714804/ (last visited Aug. 23, 2017).

82.     From 2007 to 2011, fast food workers in the U.S. drew an average of $7 billion of public assistance annually because of low wages.

83.     Anonymous aggregated data, collected by *Glassdoor,* shows that Pizza Hut pays entry-level employees in the United States between $7 per hour and $13 per hour, with an average of $7.54 per hour.  Shift Managers are paid an average of $9.76 per hour.

84.     Pizza Hut workers have on occasion decided to strike over pay, with most of the employees on strike seeking to be paid $15.00.  Pizza Hut has helped franchise owners beat back union-backed strikes calling for living wages.[34]

85.     In 2014, Pizza Hut workers, with thousands of others, participated in a nationwide fast food workers' strike demanding a $15 minimum wage, which they believe reflects a livable wage.  Workers nationwide walked off the job, staged sit-ins, and forced some franchises to close for the day.[35]

86.     Pizza Hut is a member of the American Pizza Community ("APC"), a powerful arm of the food industry lobby specifically speaking for "Big Pizza." The APC coalition was founded in 2010 and includes many of the nation's other largest pizza retailer chains, including Domino's, Papa John's, and Little Caesars—each of which, like Pizza Hut, is a franchisor. Among other causes, the APC has been an active critic of the Department of Labor's final ruling on overtime eligibility in 2016. That ruling doubled the overtime salary threshold from $23,660 to $47,476, guaranteeing overtime pay for millions of additional workers.

---

[34] https://www.glassdoor.com/Salary/Pizza-Hut-Salaries-E10090.htm (last visited Aug. 23, 2017).
[35] http://www.motherjones.com/politics/2014/09/fast-food-worker-strike-civil-disobedience/ (last visited Aug. 23, 2017).

87.     Pizza Hut and its franchisees are well-versed in no-poaching efforts as they regularly employ highly restrictive "non-compete" agreements binding the franchise owners. Pursuant to the franchise agreement, during the franchise term, Pizza Hut franchisees are contractually prohibited from engaging indirectly or directly in any other business that operates restaurants that sell pizza, pasta or other food items "similar to" Pizza Hut menu items.[36]  Upon termination of the franchise, Pizza Hut franchisees are prohibited from engaging directly or indirectly in the production or sale of pizza, pasta, or any foods "similar to" Pizza Hut menu items anywhere within 25 miles of any Pizza Hut location, anywhere within the same county as a Pizza Hut location, or anywhere within 10 miles of where a franchisee or affiliate operates a system restaurant.[37]

88.     Additional evidence also supports the notion that franchisees have agreed not to hire each other's management employees and had means to police that agreement.

89.     Pizza Hut form employment applications include a specific inquiry into whether the candidate has ever been employed by Pizza Hut, a subsidiary, or a franchisee. The application requests information about the dates, location, and supervisor relating to any such employment. This request is separate from the general employment history section. The potential employer can use this information to quickly determine whether the no-hire agreement is implicated for the applicant. The application indicates that "Falsification of this information will result in immediate termination."

90.     In addition to their shared motivation to enforce the no-hire agreement, and their actual understanding of the no-hire agreement, Pizza Hut franchisees also have abundant

---

[36] Exhibit A, Section 12.2.
[37] *Id.* at Section 12.3.

opportunity to communicate about and coordinate their no-hire agreement. Pizza Hut holds regular franchise conventions at which franchisees have an opportunity to meet and discuss their no-poaching scheme. Pizza Hut franchisees also take part in the International Pizza Hut Franchise Holder Association (IPHFHA), which conducts at least annual Spring gatherings at convention centers in desirable destination locations. The IPHFHA has conducted annual meetings at least back to 2011.

91.     Pizza Hut franchisees also participate in shared advertising groups in connection with which they communicate with other nearby franchisees. Pizza Hut mandates franchisee participation in a national "Purchasing Co-operative" with other franchisees and, from time to time, establishes co-operative advertising associations for groups of System Restaurants. All of these programs present ample opportunity for franchisees to communicate and coordinate about their shared no-hire agreement.

***Employment with Non-Pizza Hut Brands is Not a Reasonable Substitute for Pizza Hut Employees***

92.     Training, education, and experience within the Pizza Hut system are not transferrable to other restaurants for a number of reasons.

93.     Pizza Hut's franchises utilize Pizza Hut's own proprietary computer systems and platforms, including proprietary applications and data systems, for which new franchises must pay Pizza Hut standard support and maintenance fees, and must purchase through Pizza Hut's approved suppliers and vendors. Experience with these systems is of little value to other restaurants.[38]

---

[38] *See* Exhibit A at § 6.11.

94.     Pizza Hut franchises also utilize proprietary store operating procedures, Pizza Hut's bookkeeping/accounting procedures, and Pizza Hut's prescribed equipment.[39]  Training is also mandatory for Pizza Hut managers, which is accomplished through proprietary curricula and systems.  According to Pizza Hut's Franchise Agreement, the "course content, format, operation, and manner of conducting these training programs will be in the sole control of [Pizza Hut]."[40]

95.     A no-hire agreement like the agreement among Pizza Hut franchisees reduces managers' outside options and lowers their quit rate, thereby increasing the share of net-returns captured by employers.  Further, a franchise-wide no-hire agreement increases the specificity of human capital investment, as training that is productive throughout the franchise chain can be used only by a single franchisee pursuant to the agreement.

## REPRESENTATIVE PLAINTIFF ALLEGATIONS

### Plaintiff Kristen Ion

96.     In 2011, Plaintiff began working as a shift manager for Aurora Huts, LLC, at its various Pizza Hut Stores in Allegheny County, and other counties located in Pennsylvania.  At all relevant times herein, Plaintiff was paid on an hourly basis.

97.     Plaintiff was hired to train as a shift manager and was promised $9/hour as her hourly wage.  However, she was only paid $7.25 per hour upon hire as shift manager.  After going through special management training, Plaintiff received a pay rate of $8.05 per hour and continued to work as a shift manager at twelve different stores owned by Aurora Huts, LLC.

98.     Plaintiff frequently covered extra shifts and would often put in 70-plus hour work weeks.

---

[39] *See* Exhibit A at §§ 6, 8 and 11, generally.
[40] Exhibit A at § 4.1.

99.     Plaintiff never received a promotion, although she was promised promotions multiple times over the she has worked for Aurora Huts.  When she complained about her hourly rate, she was ignored.  Plaintiff would only receive a raise when she threatened to quit or provided her two-week notice.

100.    Plaintiff is still employed as a shift manager with Aurora Huts.  Her training is in Pizza Hut management, which is only valuable and transferrable within the Pizza Hut system.  The no-hire agreement among Pizza Hut franchisees has suppressed her wages, inhibited her employment mobility, and lessened her professional work opportunities.

***Antitrust Injury***

101.    Plaintiff has suffered reduced wages, reduced employment benefits, loss of professional growth opportunities, and worsened working conditions because of the express restraint of trade among Pizza Hut franchisees, as orchestrated by Pizza Hut itself.

102.    Suppressed wages and employment benefits resulting from employers' agreement not to compete with each other in the labor market is injury of the type the antitrust laws were intended to prevent and flows from that which makes the no-hire agreement unlawful.

103.     Indeed, the no-hire agreement embodies norms that are widely accepted across the fast-food industry and familiar to franchisees.  In advising new restaurant owners on how to hire their first general manager, one industry expert instructs that, "you have to be careful that you do not earn a reputation for stealing other people's employees."

104.    The potential for broader collusion in franchise chains is enhanced when no-poach agreements are in place.  Collusion is promoted when the no-poach agreements can be easily generated and monitored amongst a concentrated group of competitors who all stand to gain profits from the collusion while maintaining similar costs.

105.    The Pizza Hut franchisees' no-hire agreement significantly restricts employment opportunities for low-wage workers at all Pizza Hut restaurants, including those who have not sought employment with a competitor franchise and those who have not been contacted by a competitor franchise. Such a restriction causes a wider effect upon all Pizza Hut employees.

106.    Plaintiff was a victim of the no-hire agreement. By adhering to that agreement, otherwise independently owned and operated competitor businesses suppressed wages and stifled labor market competition for improved employment opportunities.

## CLASS ALLEGATIONS

107.    Plaintiff brings this action on her own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3).

Nationwide Class:

> All persons in the United States who are current or former managers at all franchisee-operated Pizza Hut restaurants.

108.    Alternatively, Plaintiff brings this action on her own behalf, and on behalf of a Class of Pennsylvania residents pursuant to Rule 23(a), 23(b)(2), and/or 23(b)(3).

Pennsylvania Class:

> All persons in the State of Pennsylvania who are current or former managers at all franchisee-operated Pizza Hut restaurants.

109.    Except where necessary to differentiate, the Nationwide Class, the Pennsylvania Class, and their members shall be referred to herein as the "Class," the "Classes" or "Class Members."   Excluded from the Classes are Defendant Pizza Hut, its affiliates, officers and directors, and the Judge(s) assigned to this case.  Plaintiff reserves the right to modify, change, or expand the Class definitions on discovery and further investigation.

110.    Numerosity:  Upon information and belief, the Classes are so numerous that joinder of all members is impractical; there are thousands of Pizza Hut restaurants in the U.S.  While the exact number and identities of the individual Members of the Classes are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that thousands of Class Members are the subjects of the Class.

111.    Existence and Predominance of Common Questions of Fact and Law:  Common questions of fact and law exist as to all Members of the Class.  These questions predominate over the questions affecting individual Class Members.  These common legal and factual questions include, but are not limited to, whether:

a.    Defendant engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

b.    Defendant's conduct constituted unfair competition;

c.    Defendant's conduct constituted unlawful, unfair, and fraudulent business acts and practices;

d.    Defendant violated the Sherman Antitrust Act, 15 U.S.C. §§ 1, *et seq.*;

e.    Defendant violated the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code § 15.01, *et seq.*;

f.    Defendant violated the Deceptive Trade Practices Consumer Protection Act, Tex. Bus. & Com. Code § 17.41, *et seq.*;

g.    Defendant should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

h.  Plaintiff and Class Members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

i.  The amount and nature of such relief to be awarded to Plaintiff and the Class.

112.  Typicality:  All of Plaintiff's claims are typical of the claim of the Class inasmuch as Plaintiff was a Pizza Hut franchisee restaurant manager and each Member of the Class either was or is a Pizza Hut owned or franchisee restaurant manager subject to the same agreements and rules as Plaintiff.  Further, Plaintiff and all the Members of the Class sustained the same monetary and economic injuries of being subjected to artificial suppression of compensation, wages, benefits, and growth opportunity, and the remedy sought for each is the same in which Plaintiff seeks relief against Defendant for herself and all absent Class Members.

113.  Adequacy:  Plaintiff is an adequate representative because her interest does not conflict with the interest of the Classes that she seeks to represent, she has retained counsel competent and highly experienced in complex Class Action litigation, and she intends to prosecute this action vigorously.  The interest of the Class will be fairly and adequately protected by Plaintiff and her counsel.

114.  Superiority:  A Class Action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Classes.  The injuries suffered by each individual Class Member is relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  It would be virtually impossible for members of the Classes individually to redress effectively the wrongs done to them.  Even if the Members of the Classes could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for

inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the Class Action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, Members of the Classes can be readily identified and notified based on, inter alia, Defendant's employment records and franchisees' records.

115. Defendant has acted, and refuses to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, *et seq.*

(By Plaintiff on Behalf of the Nationwide Class and, Alternatively, the Pennsylvania Class)

116. Plaintiff, on behalf of herself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint, and further alleges against Defendant as follows:

117. Beginning no later than 2013, Defendant orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

118. Defendant engaged in predatory and anticompetitive behavior by orchestrating an agreement to restrict competition among Pizza Hut franchisees, which unfairly suppressed management employee wages, and unreasonably restrained trade.

119. Defendant's conduct included concerted efforts, actions and undertakings among the Defendant and franchisee owners with the intent, purpose and effect of: (a) artificially suppressing the compensation of Plaintiff and Class Members; (b) eliminating competition among

franchise owners for skilled labor; and (c) restraining management employees' ability to secure better compensation, advancement, benefits, and working conditions.

120.    Defendant perpetuated the scheme with the specific intent of lowering costs to the benefit of Defendant and franchise owners.

121.    Defendant's conduct in furtherance of the no-hire agreement were authorized, ordered, or executed by its officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

122.    Plaintiff and Class Members have received lower compensation from Pizza Hut franchise businesses than they would otherwise would have received in the absence of Defendant's unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

123.    Defendant's contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

124.    In the alternative, Defendant is liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and labor.

125.    Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

126.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

127.    Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, costs of suit, and, pursuant to 15 U.S.C. § 26, injunctive relief, for the violations of the Sherman Act and the threatened continuing violations alleged herein.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and Members of the Class, requests that this Court:

A.    determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.    appoint Plaintiff as the representative of the Class and her counsel as Class Counsel;

C.    declare that Defendant's actions as set forth in this Complaint violate the law;

D.    award Plaintiff and the Class damages in an amount according to proof against Defendant for Defendant's violations of 15 U.S.C. §1, to be trebled in accordance with those laws;

E.    award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class Members are entitled;

F.    grant a permanent injunction enjoining Defendant from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

G.   declare Defendant be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for management employees except as prescribed by this Court;

H.   declare Defendant to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class Members;

I.   award pre-judgment and post-judgment interest on such monetary relief;

J.   award reasonable attorneys' fees and costs; and

K.   grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Date:   March 1, 2018                         Respectfully Submitted,

**STECKLER GRESHAM COCHRAN PLLC**

*/s/ Bruce W. Steckler*
Bruce W. Steckler
Texas Bar No. 00785039
L. Kirstine Rogers
Texas Bar No. 24033009
12720 Hillcrest Road – Suite 1045
Dallas, TX  75230
Telephone:  972-387-4040
Facsimile:  972-387-4041
bruce@stecklerlaw.com
krogers@stecklerlaw.com

**MCCUNE WRIGHT AREVELO, LLP**

Richard D. McCune*
California State Bar No. 132124
Michele M. Vercoski*
California State Bar No. 244010
3281 E. Guasti Road, Suite 100

Ontario, CA  91761
Tel: (909) 557-1250
Fax: (909) 557-1275
rdm@mccunewright.com
mmv@mccunewright.com

Derek Y. Brandt*
Illinois State Bar No. 6228895
100 North Main Street, Suite 11
Edwardsville, IL 62025
Tel: (618) 307-6116
Fax: (618) 307-6161
dyb@mccunewright.com

Joseph G. Sauder*
Pennsylvania State Bar No. 82467
555 Lancaster Avenue
Berwyn, PA 19312
Tel: (610) 200-0339
Fax: (610) 727-4360
jgs@mccunewright.com

\* Admitted *Pro Hac Vice*

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 1, 2018, a true and correct copy of the foregoing was served upon all counsel of record via the Court's ECF system.

/s/ Bruce W. Steckler
Bruce W. Steckler